## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Feb 03 2015, 9:02 am

*[signature]*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Cindi J. Andrews
Plymouth, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of:

A.W. (Minor Child)

And

A.W.(Mother)
*Appellant,*

v.

The Indiana Department of Child Services

February 3, 2015

Court of Appeals Cause No.
50A03-1406-JT-221

Appeal from the Marshall Circuit Court
The Honorable Curtis D. Palmer, Judge
Cause No. 50C01-1401-JT-01

*Appellee*

**Friedlander, Judge.**

[1] As.W. (Mother) appeals the involuntary termination of her parental rights to A.W. (Child). Mother challenges the sufficiency of the evidence supporting the juvenile court's judgment.

[2] We affirm.

[3] Mother gave birth to Child in February 2011. That same month, the Department of Child Services (DCS) filed a petition alleging that child was a Child in Need of Services (CHINS). A fact-finding hearing was held, at which the juvenile court found that Child was a CHINS pursuant to Mother's admission and based on its own findings that Mother was developmentally disabled and unable to independently meet all of Child's needs. At that time, the juvenile court granted wardship to the DCS, but Child remained in Mother's custody. The court ordered Mother and Child's Father, H.W. (Father), to participate in services.[1] At a review hearing in February 2012, the juvenile court granted the DCS's motion to dismiss the wardship.

[4] Within a few months of the dismissal, the DCS received reports that Mother's home was dirty, that she was engaging in sexual acts with men in Child's presence, that Mother had been talking about giving Child away, and that

---

[1] Father's parental rights were also terminated. He does not participate in this appeal.

Mother had set Child down in a busy parking lot. By that time, Father was no longer living in the residence,[2] and the DCS and Mother entered into an informal adjustment. On October 9, 2012, staff at the Bowen Center reported to the DCS that Mother was no longer able to care for herself and had threatened to harm herself, and that she had agreed to be admitted for an emergency evaluation. Additionally, the DCS had continuing concerns about a number of parenting issues, including Mother's housing instability, her inability to read Child's cues, the dirty condition of Mother's home, and Mother's failure to properly bathe Child. Due to these concerns, the DCS determined that the informal adjustment had been unsuccessful and filed a CHINS petition on October 11, 2012. An initial hearing was held on the same date, and Child was adjudicated to be a CHINS based on the court's findings that Mother had threatened suicide and asked for Child to be removed. Child was placed in foster care.

[5] The juvenile court issued its dispositional order on November 13, 2012. Pursuant to the order, Mother was required to participate in home-based therapy, continue with Rehabilitative Service Provider services through the Bowen Center, participate in supervised visitation with Child, attend individual therapy at the Bowen Center, and cooperate with the DCS. At a subsequent review hearing, Mother was also ordered to complete a psychological assessment.

---

[2] Father had moved into a residential nursing home. The record reveals that Father is no longer able to care for himself and unlikely to ever regain the ability to do so.

[6] Mother's participation in services was sporadic at best, and she made little to no progress in those services. A review hearing was held on March 7, 2013. In a subsequently-issued order on the review hearing, the juvenile court found that Mother had not complied with the case plan, noting specifically that she had missed several appointments and visits for various reasons, including that she was "angry with the service provider, was visiting [Child's] father, or was out of town without providing notice to providers or [the] DCS." *Appellant's Appendix* at 46. The court further found that the parents had not enhanced their ability to fulfill their parental obligations, and that "Mother's behavior indicates a lack of ability to care for her child, as she is unable to grasp and apply the skills that are being taught to her through home based services." *Id.* On May 30, 2013, the DCS filed a motion for rule to show cause alleging that Mother was in violation of the juvenile court's orders. The juvenile court declined to hold Mother in contempt, finding that she "lacks the mental ability to willfully disregard the dispositional orders of this court." *Id.* at 45.

[7] Another permanency hearing was held on August 1, 2013, at which Mother failed to appear but was represented by counsel. In an order issued after the hearing, the court found that Mother had not participated consistently in services and visitation since April 2013. In another order issued following a January 2, 2014 review hearing, the court found that Mother had not complied with the case plan, had not visited with Child, and "[did] not understand how to keep or maintain an appropriate and safe environment for her daughter." *Id.* at 38.

[8]     The DCS filed a petition to terminate Mother's parental rights on January 14, 2014. An evidentiary hearing was conducted on May 27, 2014, at the conclusion of which the juvenile court granted the petition. The juvenile court issued a written termination order the following day, in which it set forth the following relevant findings and conclusions:

12. The conditions that resulted in the child's removal from the mother's home and placement outside of the home included unsanitary living conditions, developmental delays and the mother not having stable housing, she was allowing unknown men to enter her residence and have sex with her in the presence of the child and there was insufficient food in the house on a regular basis resulting in the child eating cat food from off of the floor. . . .

13. The child has special needs due to developmental delays and is receiving speech and occupational therapy services while in foster care. The mother is unable to consistently provide these services to the child.

14. The mother is moderately mentally handicapped and has great difficulty in maintaining herself as her only income is from social security and she is incapable of budgeting her monthly income to provide both food and shelter for herself. She often reports going for days or weeks without eating because of a lack of money. She continues to allow men to enter her residence and have sex with her and she then gives them money leaving her without sufficient funds to support herself, most recently three weeks prior to this hearing.

15. A number of therapists and other service providers all testified that the mother has made no progress in learning how to adequately parent her child, cannot maintain stable housing and is unable, or unwilling, to take the steps necessary to provide a safe home for herself or for her child. The mother was unable to consistently appear for meetings with counselors or with home based service providers as she would not be home when transportation was arranged for her, nor would she appear for appointments which were made for her.

16. Supervised visitation between the mother and child was stopped in April of 2013 when the mother was unable to consistently appear for visits or appointments for a consecutive thirty day period of time.

17. During the pendency of the CHINS action, the mother moved

and/or was evicted from at least three residences and resides at the Red Rock Inn motel in Plymouth. Her current place of residence would not be suitable for a child. She is not employed but does received monthly SSI payments.

18. The Dispositional Order in the CHINS cause required mother to attend and participate in home based therapy and home based case management services as well as attend supervised visits with her child. All service providers testified that the mother was unable to make any progress from the limited number of sessions she actually was present for and that the mother remained unable to provide a safe environment for the child.

19. Counselor Cathy Freet of the Bowen Center testified that she provided behavioral health services for the mother regarding safety concerns and self-esteem issues and attempted to help her keep men out of her residence and stop giving away her money, but was unsuccessful. Ms. Freet advised that it was possible that the mother could make progress on these issues if she were to consistently attend therapy for at least three months, but the mother was never able to do that, and, if fact, missed approximately half of the sessions.

20. Numerous service providers testified that the mother engaged in self-harming behaviors and has made threats of suicide in the past.

21. The Court finds that the mother's history of missing therapy sessions and her mental impairments make it unlikely that she will ever make sufficient progress to safely maintain herself, much less safely raise a child.

22. The CASA also testified that the mother remained unable to safely parent the child and that the child was very happy and improving greatly in the pre-adoptive foster home and recommended that termination of the parent-child relationship is in the best interests of the child.

23. There is a reasonable probability that the conditions which resulted in the removal from the parents' home and placement outside the home will not be remedied because the father's mental and medical impairments and the mother's inability or unwillingness to address her mental health needs and her inability to learn and/or implement effective parenting and safety skills.

24. Termination of the parent-child relationship is in the best interests of the child and the continuation of the parent-child relationship threatens the well-being of the child.

*Id.* at 9-11. Mother now appeals.

[9] When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id.* In deference to the juvenile court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204 (Ind. Ct. App. 1999), *trans. denied*. Thus, if the evidence and inferences support the juvenile court's decision, we must affirm. *Id.*

[10] The juvenile court made detailed findings in its order terminating Mother's parental rights to Child. When the juvenile court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143 (Ind. 2005). First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the juvenile court's conclusions or the conclusions do not support the judgment thereon. *Quillen v. Quillen*, 671 N.E.2d 98.

[11] We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144 (Ind. Ct. App. 2008). In addition, a juvenile court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832 (Ind. Ct. App. 2001).

[12] Before an involuntary termination of parental rights may occur in Indiana, the State is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code Ann. § 31-35-2-4(b)(2)(B) (West, Westlaw current with all 2014 Public Laws of the 2014 Second Regular Session and Second Regular Technical Session of the 118th General Assembly). The State is also required to prove

that termination of parental rights is in the best interests of the child and that there is a satisfactory plan for the care and treatment of the child. I.C. § 31-35-2-4(b)(2)(C), (D). The State's burden of proof in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code Ann. § 31-37-14-2 (West, Westlaw current with all 2014 Public Laws of the 2014 Second Regular Session and Second Regular Technical Session of the 118th General Assembly)). If the court finds that the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship. I.C. § 31-35-2-8 (West, Westlaw current with all 2014 Public Laws of the 2014 Second Regular Session and Second Regular Technical Session of the 118th General Assembly).

[13] We first address Mother's challenge to the juvenile court's findings as to subsection (b)(2)(B) of the termination statute cited above. We note the DCS needed to establish only one of the three requirements of subsection (b)(2)(B) by clear and convincing evidence before the juvenile court could terminate parental rights. *See In re L.V.N.*, 799 N.E.2d 63 (Ind. Ct. App. 2003). Here, the juvenile court found the DCS presented sufficient evidence to satisfy two of those requirements, namely, that there is a reasonable probability the conditions resulting in Child's removal or continued placement outside Mother's care will not be remedied and that the continuation of the parent-child relationship poses a threat to Child's well-being. *See* I.C. § 31-35-2-4(b)(2)(B)(i), (ii). We focus our inquiry on the requirements of subsection (b)(2)(B)(i)—that is, whether there was sufficient evidence to establish a reasonable probability that the conditions

resulting in Child's removal or continued placement outside Mother's care will not be remedied.

[14] In making such a determination, a juvenile court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child. *Id.* In making this determination, courts may consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244 (Ind. Ct. App. 2002), *trans. denied*. The juvenile court may also consider the parent's response to the services offered through the DCS. *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366 (Ind. Ct. App. 2007), *trans. denied*. Moreover, the failure to exercise visitation demonstrates a "lack of commitment to complete the actions necessary to preserve [the] parent-child relationship." *Id.* (quoting *In re A.L.H.*, 774 N.E.2d 896, 900 (Ind. Ct. App. 2002)) (alteration in original). The language of Indiana's termination statute makes clear that "it is not just the basis for the initial removal of the child that may be considered for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside of the home." *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*.

[15] In support of her argument that the DCS presented insufficient evidence to prove that the conditions resulting in Child's removal and continued placement outside of the home will not be remedied, Mother argues out that her therapist, Cathy Freet, testified that Mother could make progress toward her goals of improving her self-esteem and addressing safety issues if she were to consistently attend counseling for three months. According the Mother, this testimony demonstrates that "the conditions that led to the removal of the child could be remedied, in a relatively short amount of time." *Appellant's Brief* at 14.

[16] As an initial matter, we note that Freet testified that Mother could "theoretically" complete services within three months if she consistently came to counseling sessions, but that "without any history of that happening, I'm not sure I'm able to give a time frame where she would be able to complete her goals." *Transcript* at 72. Thus, Freet's testimony regarding Mother's ability to not only complete services, but to successfully address her parenting issues, was speculative at best. In any event, Freet also testified that Mother did not attend counseling consistently and would often cancel sessions or simply fail to show up. Accordingly, even assuming that Mother *could* make progress if she attended counseling, the juvenile court had ample reason to believe that Mother would not attend counseling, and therefore make no progress. Moreover, Mother failed to exercise supervised visitation, and she did not successfully complete any of the services ordered. All of the service providers agreed that Mother had made little to no progress toward addressing her parenting deficiencies. The juvenile court's finding that the conditions leading to Child's

removal and continued placement outside the home would not be remedied is supported by the evidence.

[17] Mother also argues that the juvenile court's conclusion that termination was in Child's best interest was unsupported by the evidence. In determining whether termination of parental rights is in the best interests of a child, the juvenile court is required to look beyond the factors identified by the DCS and consider the totality of the evidence. *In re J.C.*, 994 N.E.2d 2778 (Ind. Ct. App. 2013). In so doing, the juvenile court must subordinate the interests of the parent to those of the child, and the court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185 (Ind. Ct. App. 2003). "A parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that termination of the parent-child relationship is in the child's best interests." *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006), *trans. denied*. "Additionally, a child's need for permanency is an important consideration in determining the best interests of a child, and the testimony of the service providers may support a finding that termination is in the child's best interests." *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010).

[18] Mother takes issue with several of the juvenile court's findings supporting its determination that termination is in Child's best interests. First, Mother notes that the juvenile court made specific findings that Child suffers from developmental delays and that Mother is moderately mentally handicapped.

Mother argues that these facts should not be "used against" her because she "likely understands the difficulties that may be imposed by having developmental delays, and it could be a benefit to understand such delays[.]" *Appellant's Brief* at 11. It is quite clear from our review of the juvenile court's order, however, that it did not find that termination was in Child's best interests based on Mother's or Child's mental disabilities. Instead, the court made note of Mother's mental condition as a possible reason for her failure to make progress in services and address her parenting deficiencies. Similarly, the juvenile court made note of Child's developmental disabilities in reference to the additional services she needs and Mother's inability to meet those needs. When viewed in context, these findings support the juvenile court's determination that termination of the parent-child relationship was in Child's best interests.

[19] Mother also notes that the juvenile court found that Mother had great difficulty budgeting her income to provide food for herself and maintain a safe and suitable home. According to Mother, however, this difficulty stemmed from the fact that when Child was removed, Mother lost additional social security income paid for the benefit of Child. Thus, Mother argues that her financial condition "should not be used against [her] because if [M]other were to receive both checks from social security she would likely have enough income in to [sic] maintain adequate food and shelter for both she and her child." *Id.* at 12. Mother also asserts that her "self-esteem may have improved once she was less frustrated with not having enough income to secure affordable housing which

in turn might have met some of the goals that service providers were wanting [M]other to meet, and in addition – show [M]other's progress." *Id.* at 12-13. Mother's argument on these points is purely speculative. Moreover, the juvenile court made specific findings that Mother's financial difficulties stemmed in large part from her inability to budget and her habit of giving her money away to men. Mother has made no attempt to explain how an increased income would remedy these problems. Ultimately, Mother's argument in this regard is nothing more than a request to reweigh the evidence. The juvenile court's findings concerning Mother's difficulty budgeting her income to provide food and shelter for herself and Child support its determination that termination of the parent-child relationship is in Child's best interests.

[20] Finally, Mother takes issue with the juvenile court's finding that the CASA testified that Child was happy and progressing well in her foster home. According to Mother, the CASA testified that Child had progressed "just because of her age." *Id.* at 13. Thus, according to Mother, "it is just as possible that [C]hild could have shown progress in [M]other's care as well, just because of her age and therefore the fact that child has progressed in the pre-adoptive foster home should not be held against [M]other[.]" *Id.* Mother has mischaracterized the CASA's testimony. On direct examination, the CASA testified as follows:

> Q: How has she progressed since the time that she was placed in foster care or a foster home and today?
> A: Well, just because of her age she has progressed, but – um – she's just learning and changing all the time. Um –

Q: What do you attribute that to?
A: *Her surroundings. Um – having support of people there for her, teaching her things – um – being in a safe place.*

*Transcript* at 103-04 (emphasis supplied). Thus, it is apparent that the CASA believed that Child's progress was due not only to her age, but also to her surroundings, i.e., her pre-adoptive foster home.

[21] The juvenile court's finding that termination of the parent-child relationship was in Child's best interests was amply supported by the evidence. Multiple service providers testified that Mother had made no progress toward addressing her parenting issues during the underlying CHINS proceedings. At the time of the termination hearing, Mother still had not obtained safe and appropriate housing for Child, and she did not appear to have any prospects of doing so in the near future. The evidence demonstrated that Mother was unable to provide for her own basic needs, much less Child's. Moreover, Child was happy and progressing well in her pre-adoptive foster home, and both the family case manager and the CASA testified that termination was in Child's best interests. For all of these reasons, we conclude that the juvenile court's termination decision was supported by sufficient evidence.

[22] Judgment affirmed.

Kirsch, J., and Crone, J., concur.